## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HAYLEY BOURQUE, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: _____ |
| | **CLASS ACTION COMPLAINT** |
| v. | |
| NAUTIC PARTNERS, LLC, | **JURY TRIAL DEMAND** |
| Defendant. | |

Plaintiff Hayley Bourque ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Nautic Partners, LLC ("Nautic Partners" or "Defendant") to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record:

## NATURE OF THE ACTION

1.    This class action arises out of the recent cyberattack and data breach ("Data Breach") resulting from Defendant's failure to implement reasonable and industry standard data security practices.

2.    Defendant is a Rhode Island-based private equity firm.

3.    The PII compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves.

4.    The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' PII from a foreseeable and preventable cyber-attack.

1

5.     Defendant maintained the PII in a reckless manner. In particular, the PII was maintained on Defendant's computer networks in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

6.     Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

7.     Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the PII that Defendant collected and maintained is now in the hands of data thieves.

8.     Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns

using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

9.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

10.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) Plaintiff experiencing multiple fraudulent charges, for nearly $1000, to her Eastern Bank debit card, in or about March 2023; (viii) Plaintiff experiencing fraudulent charges, for approximately $400, to her Food Stamp card, in or about March 2023; (ix) statutory damages; (x) nominal damages; and (xii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

11.     Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

12.     Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class

Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

13.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach.

14.     Plaintiff seeks remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

15.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct.

## PARTIES

16.     Plaintiff Hayley Bourque is a resident and citizen of Melrose, Massachusetts.

17.     Defendant is a limited liability organized under the laws of the state of Delaware with its principal place of business located in Providence, Rhode Island.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class, including Plaintiff, are citizens of states different from Defendant.

19.     This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

21.     Defendant is a Rhode Island-based private equity firm.

22.     Plaintiff and Class Members, directly or indirectly, entrusted Defendant with sensitive and confidential PII, which includes information that is static, does not change, and can be used to commit myriad financial crimes.

23.     Defendant retains and stores this information and derives a substantial economic benefit from the PII that they collect. But for the collection of Plaintiff's and Class Members' PII, Defendant would be unable to perform its services.

24.     The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

25.     Upon information and belief, Defendant made promises and representations to consumers, including Plaintiff and Class Members, that the PII collected from them would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

26.     Indeed, Defendant provides on its website that: "[w]e are committed to protecting the PII you entrust to us. We implement security measures designed to protect any PII submitted by or collected from you from unauthorized access. We further protect your PII from potential security breaches by implementing certain technological security measures in accordance with generally accepted industry practices. In addition, we limit access to your PII to those employees,

agents, contractors and other third parties who have a business need to know. They will only process your PII on our instructions and they are subject to a duty of confidentiality."[1]

27.     Plaintiff and Class Members entrusted their PII to Defendant, directly or indirectly, with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

28.     Plaintiff and the Class Members value, and have taken reasonable steps to maintain, the confidentiality of their PII. Plaintiff and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

29.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's PII safe and confidential.

30.     Defendant had obligations created by FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

31.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

32.     Plaintiff and the Class Members relied on Defendant to implement and follow adequate data security policies and protocols, to keep their PII confidential and securely

---

[1] https://nautic.com/privacy-policy/

maintained, to use such PII solely for business purposes, and to prevent the unauthorized disclosures of their PII.

33.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

### The Data Breach

34.    On or about January 12, 2024, Defendant began sending Plaintiff and other Data Breach victims an untitled letter (the "Notice Letter"), informing them that:

*What Happened?*

We discovered unauthorized access to our network occurred between February 23, 2023 and April 5, 2023.

*What We Are Doing.*

We immediately launched an investigation in consultation with outside cybersecurity professionals who regularly investigate and analyze these types of situations to analyze the extent of any compromise of the information on our network.

*What Information Was Involved?*

Based on our comprehensive investigation and manual review of files that were potentially accessed or removed from our network, which concluded on December 29, 2023, we discovered that your full name and the following were contained in the aforementioned files: Social Security number.[2]

35.    Omitted from the Notice Letter were the date that Defendant detected the Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

---

[2] The "Notice Letter". A sample copy is available at https://apps.web.maine.gov/online/aeviewer/ME/40/570e5c34-bdb2-46f1-af58-cd73c90eabc1.shtml

36. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

37. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

38. The attacker accessed and acquired files Defendant shared with a third party containing unencrypted PII of Plaintiff and Class Members, including their Social Security numbers and other sensitive information. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

39. Plaintiff further believes that her PII and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

***Data Breaches Are Preventable***

40. The unencrypted PII of Class Members may end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

41. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members,

causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

42.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

43.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[3]

44.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

---

[3] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[4]

45.    To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**

-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

 -    Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

---

[4] *Id.* at 3-4.

-     Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-     Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-     Monitor for adversarial activities
-     Hunt for brute force attempts
-     Monitor for cleanup of Event Logs
-     Analyze logon events;

**Harden infrastructure**

-     Use Windows Defender Firewall
-     Enable tamper protection
-     Enable cloud-delivered protection
-     Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[5]

46.     Given that Defendant was storing the PII of consumers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

47.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of more than seven thousand individuals,[6] including that of Plaintiff and Class Members.

***Defendant Acquires, Collects, And Stores Plaintiff's and the Class's PII***

48.     Defendant has historically acquired, collected, stored, and shared the PII of Plaintiff and Class Members.

---

[5] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

[6] According to the breach report submitted to the Office of the Maine Attorney General, 7,870 persons were impacted in the breach. *See* https://apps.web.maine.gov/online/aeviewer/ME/40/570e5c34-bdb2-46f1-af58-cd73c90eabc1.shtml

49.     By obtaining, collecting, sharing, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

50.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

51.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members.

52.     Upon information and belief, Defendant made promises to consumers to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

53.     Indeed, Defendant provides on its website that: "[w]e are committed to protecting the PII you entrust to us. We implement security measures designed to protect any PII submitted by or collected from you from unauthorized access. We further protect your PII from potential security breaches by implementing certain technological security measures in accordance with generally accepted industry practices. In addition, we limit access to your PII to those employees, agents, contractors and other third parties who have a business need to know. They will only process your PII on our instructions and they are subject to a duty of confidentiality."[7]

54.     Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

55.     Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

***Defendant Knew or Should Have Known of the Risk Because Private Equity Firms In Possession Of PII Are Particularly Suspectable To Cyber Attacks***

---

[7] https://nautic.com/privacy-policy/

56.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting private equity firms that collect and store PII, like Defendant, preceding the date of the breach.

57.     Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

58.     In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[8]

59.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

60.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[9]

---

[8] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/
[9] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection

61.     Additionally, as companies became more dependent on computer systems to run their business,[10] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[11]

62.     As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

63.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

64.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

65.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to more than seven thousand individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[10]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[11] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

66.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

67.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

68.     As a private equity firm in possession of consumers' PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if its data security systems, or those on which it transferred PII, were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

### *Value of Personally Identifiable Information*

69.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[12] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

---

[12] 17 C.F.R. § 248.201 (2013).
[13] *Id.*

70.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[14]

71.     For example, PII can be sold at a price ranging from $40 to $200.[15] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

72.     Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[17]

73.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[14] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
[15] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[16] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/
[17] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

74.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

75.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

76.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[18]

77.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

78.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

---

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

[19] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

***Defendant Fails to Comply with FTC Guidelines***

79.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

80.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

81.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

82.     The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

83.     These enforcement actions include actions against private equity firms, like Defendant.

84.     Defendant failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

85.     Defendant was at all times fully aware of their obligation to protect the PII of the consumers in its network. Defendant were also aware of the significant repercussions that would result from its failure to do so.

***Defendant Failed to Comply with Industry Standards***

86.     As noted above, experts studying cyber security routinely identify private equity firms in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

87.     Several best practices have been identified that a minimum should be implemented by private equity firms in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

88.     Other best cybersecurity practices that are standard in the private equity industry include installing appropriate malware detection software; monitoring and limiting the network

ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

89.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

90.    These foregoing frameworks are existing and applicable industry standards for the private equity industry. Upon information and belief, Defendant failed to comply with at least one––or all––of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### *Common Injuries and Damages*

91.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly

increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

### The Data Breach Increases Victims' Risk Of Identity Theft

92.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

93.     The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

94.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

95.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

96.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social

engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

97.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[20]

98.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

99.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[20] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

100.    The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

101.    Thus, even if certain information (such as insurance information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

102.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### *Loss Of Time To Mitigate Risk Of Identity Theft And Fraud*

103.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

104.    Thus, due to the actual and imminent risk of identity theft, Defendant, in its Notice Letter, instructs Plaintiff and Class Members to take the following measures to protect themselves from identity theft and fraud: "you should always remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis."[21]

105.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach, contacting Defendant to obtain more details about the Data Breach and how Defendant came into possession

---

[21] Notice Letter.

of their PII, contacting financial institutions to sort out fraudulent activity on their accounts, visiting government offices to sort out fraudulent activity on their accounts, replacing impacted debit cards, and securing their financial accounts.

106.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

107.    These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

108.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[24]

***Diminution Value Of PII***

---

[22] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[23] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

[24] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

109.    PII is a valuable property right.[25] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

110.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[26]

111.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[27,28]

112.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[29]

113.    Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[30]

114.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.

---

[25] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[26] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[27] https://datacoup.com/
[28] https://digi.me/what-is-digime/
[29] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html
[30] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

115.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

116.    In the Notice Letter, Defendant makes an offer of 24 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' Private Information.

117.    Defendant's offer of credit and identity monitoring establishes that Plaintiff's and Class Members' sensitive Private Information was in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

118.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

119.    The fraudulent activity resulting from the Data Breach may not come to light for years.

120.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including,

specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

121.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to more than seven thousand individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

122.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *Future Cost of Credit & Identity Theft Monitoring is Reasonable and Necessary*

123.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

124.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

125.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

126.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

**Plaintiff Bourque's Experience**

127.    Plaintiff Hayley Bourque does not know how or when Defendant obtained her PII, and she was not familiar with Defendant before receiving the Notice Letter.

128.    At the time of the Data Breach—February 23, 2023 through April 5, 2023— Defendant retained Plaintiff's PII in its system.

129.    Plaintiff Bourque is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

130.    Plaintiff Hayley Bourque received the Notice Letter, by mail, from Defendant, dated January 12, 2024. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name and Social Security number.

131.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff to "remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis[,]"[31] Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, contacting Defendant to obtain more details about the Data Breach and how Defendant came into possession of her PII, contacting financial institutions to sort out fraudulent activity on her accounts, visiting government offices to sort out fraudulent

---

[31] Notice Letter

activity on her accounts, replacing impacted debit cards, and securing her financial accounts. Plaintiff has spent significant time on mitigation activities in response to the breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

132.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) statutory damages; (vii) nominal damages; and (vii) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

133.    Plaintiff also suffered actual injury in the form of experiencing multiple fraudulent charges to her Eastern Bank debit card, for nearly $1000, in or about March 2023, which, upon information and belief, was caused by the Data Breach.

134.    Plaintiff also suffered actual injury in the form of experiencing multiple fraudulent charges to her Food Stamp, for approximately $400, in or about March 2023, which, upon information and belief, was caused by the Data Breach.

135.    Plaintiff further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

136.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

137.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

138.    Plaintiff Hayley Bourque has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

139.    Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

140.    This action is properly maintainable as a class action. Plaintiff brings this class action on behalf of herself and on behalf of all others similarly situated.

141.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

**Nationwide Class**
All persons in the United States whose PII was maintained on Defendant's computer systems that were compromised in the Data Breach announced by Defendant in January 2024 (the "Class").

142.    Excluded from the Class are Defendant's officers and directors; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

143.    Plaintiff reserves the right to amend the definitions of the Class as well as add a Class and/or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

144.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

145.    <u>Numerosity</u>. The members of the Class are so numerous that joinder of all of them is impracticable. Although the precise number is currently unknown to Plaintiff and exclusively in the possession of Defendant, according to the breach report submitted to the Office of the Maine Attorney General, at least 7,000 persons were impacted in the Data Breach.[32]

146.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a)    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

b)    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the cyber-attack;

c)    Whether Defendant's data security systems prior to and during the cyber-attack complied with applicable data security laws and regulations;

d)    Whether Defendant's data security systems prior to and during the cyber-attack were consistent with industry standards;

---

[32] https://apps.web.maine.gov/online/aeviewer/ME/40/570e5c34-bdb2-46f1-af58-cd73c90eabc1.shtml

e)  Whether Defendant owed a duty to Class Members to safeguard their PII;

f)  Whether Defendant breached its duty to Class Members to safeguard their PII;

g)  Whether computer hackers obtained Class Members' PII in the cyber-attack;

h)  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i)  Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j)  Whether Defendant owed a duty to provide Plaintiff and Class Members notice of this data breach, and whether Defendant breached that duty;

k)  Whether Defendant's conduct was negligent;

l)  Whether Defendant's acts, inactions, and practices complained of herein amount to an invasion of privacy;

m)  Whether Defendant's actions violated federal law; and

n)  Whether Plaintiff and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

147.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the cyber-attack.

148.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

149.  <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the

same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

150.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most class members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

151.    Defendant has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

### COUNT I
**Negligence**
**(On Behalf of Plaintiff and the Class)**

152.    Plaintiff re-alleges and incorporates by reference all proceeding allegations above and hereafter as if fully set forth herein.

153.    Defendant collected and maintained the PII of Plaintiff and Class Members, who had no ability to influence or affect Defendant's data security policies.

154.    Plaintiff and the Class Members, directly or indirectly, entrusted their PII to Defendant with the understanding that Defendant would safeguard their information.

155.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

156.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

157.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

158.    Section 5 of the FTC Act, as interpreted and enforced by the FTC, prohibits the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the members of the Class's sensitive PII.

159.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

160.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems;

c. Allowing unauthorized access to Class Members' PII;

d. Failing to detect in a timely manner that Class Members' PII had been compromised;

e. Failing to remove former consumers' PII it was no longer required to retain pursuant to regulations,

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g. Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

161.    Plaintiff and members of the Class are within the class of persons that the FTC Act intended to protect.

162.    The harm that occurred as a result of the Data Breach is the type of harm that the FTC Act intended to guard against. The FTC has pursued enforcement actions against employers, which, as a result of failures to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm to its consumers as that suffered by Plaintiff and members of the Class.

163.    Defendant's conduct constitutes negligence because it was in violation of Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards.

164.    Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendant's magnitude, including, specifically, the immense damages that would result to Plaintiff and Members of the Class due to the valuable nature of the PII at issue in this case—including Social Security numbers.

165.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the private equity industry.

166.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

167.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

168.    As a result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) Plaintiff experiencing multiple fraudulent charges, for nearly $1000, to her Eastern Bank debit card, in or about March 2023; (viii) Plaintiff experiencing fraudulent charges, for approximately $400, to her Food Stamp card, in or about March 2023; (ix) statutory damages; (x) nominal damages; and (xii)

the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

169.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

170.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### COUNT II
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

171.     Plaintiff re-alleges and incorporates by reference all proceeding allegations above and hereafter as if fully set forth herein.

172.     Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of providing their valuable PII to Defendant.

173.     Plaintiff and Class Members provided Defendant their PII, directly or indirectly, on the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue it derived therefrom. In exchange, Plaintiff and Class Members should have received adequate protection and data security for their PII held by Defendant.

174.     Defendant benefited from receiving Plaintiff's and Class Members' labor and from receiving their PII through its ability to retain and use that information for its own benefit. Defendant understood and accepted this benefit.

175.     Defendant knew Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

176.     Because all PII provided by Plaintiff and Class Members was similarly at risk from a foreseeable and targeted data breach, Defendant's obligation to safeguard the PII it collected from its consumers was inherent to the relationship.

177.     Defendant also understood and appreciated that Plaintiff's and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

178.     Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members.

179.     Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

180.     Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead made calculated decisions to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

181.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

182.    Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

183.    Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

184.    If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

185.    Plaintiff and Class Members have no adequate remedy at law.

186.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) Plaintiff experiencing multiple fraudulent charges, for nearly $1000, to her Eastern Bank debit card, in or about March 2023; (viii) Plaintiff experiencing fraudulent charges, for approximately $400, to her Food Stamp card, in or about March 2023; (ix) statutory damages; (x) nominal damages; and (xii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

187.    Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

v.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi.   prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.   requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi.   requiring Defendant to conduct regular database scanning and securing checks;

xii.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii.  requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.  requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.  requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal

identifying information to third parties, as well as the steps affected individuals must take to protect herself;

xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii.    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Date: January 31, 2024                     Respectfully Submitted,

/s/*Vincent L. Greene*
Vincent L. Greene
Motley Rice LLC
40 Westminster St., 5th Floor
Providence, RI 02903
vgreene@motleyrice.com
Ph. (401) 457 – 7730
Fx. (401) 457 – 7708

David K. Lietz*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, LLC**
5335 Wisconsin Avenue NW
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

*Attorney for Plaintiff and*
*the Putative Class*

*\*Pro Hac Vice application forthcoming*